J-A26002-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| NICHOLAS BRACCIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ARG CA2PSLB001, LLC., FIRST | : | |
| NATIONWIDE TITLE AND VISITEL | : | |
| ENTERPRISES CORP | : | No. 1456 EDA 2020 |
| | : | |
| | : | |
| APPEAL OF: VISITEL ENTERPRISES | : | |
| CORP | : | |

Appeal from the Order Entered July 22, 2020
In the Court of Common Pleas of Bucks County Civil Division at No(s):
No. 2018-04758

BEFORE: BOWES, J., STABILE, J., and McCAFFERY, J.

MEMORANDUM BY BOWES, J.: **FILED JANUARY 03, 2022**

Visitel Enterprises Corp ("Visitel") appeals from the order denying Visitel's preliminary objections concerning alternative dispute resolution of the underlying action, which was filed by Nicholas Braccia ("Braccia") against Thaddeus Pryor, James Perretty, Joseph Letzelter,[1] Visitel, World Wide Child Care ("WWCC"), Silverberg and Weiss, PA, Paul K. Silverberg, Esquire, Marcus & Millichap Capital Corporation, First Nationwide Title, and ARG CA2PSLB001, LLC.[2] We affirm.

---

[1] Pryor, Perretty, and Letzelter were senior executives of Visitel.

[2] We observe that

*(Footnote Continued Next Page)*

In 2004, Braccia and Visitel formed Braccia/Visitel, LLC ("BV") and Braccia/Visitel 2, LLC ("BV2") as co-equal members.[3]  They established BV and BV2 to own and develop property in New Britain and Warminster, respectively, and construct a building thereon for use by Children of America Child Care Center ("COA"), a Florida corporation of which Pryor, Perretty, and Letzelter were senior executives.  Both BV and BV2 were governed by operating agreements, which provided that "each LLC matter shall be decided by unanimous vote of the members."  BV Operating Agreement at 3; BV2 Operating Agreement at 3.  The operating agreements also included the following arbitration provision:

_____

> "[a]s a general rule, an order [overruling] a party's preliminary objections is interlocutory and, thus, not appealable as of right." ***Callan v. Oxford Land Development, Inc.***, 858 A.2d 1229, 1232 (Pa.Super. 2004).  Rule 311 of the Pennsylvania Rules of Appellate Procedure, however, allows an interlocutory appeal as of right from any order which is made appealable by statute.  Pa.R.A.P. 311(a)(8).  The Uniform Arbitration Act permits an immediate appeal from a "court order denying an application to compel arbitration made under section 7304 (relating to proceedings to compel or stay arbitration)."  42 Pa.C.S. § 7320(a)(1).  Section 7304 of the Uniform Arbitration Act is applicable by way of 42 Pa.C.S. 7342(a) (incorporating specified sections of Uniform Arbitration Act in common law arbitration).

***Provenzano v. Ohio Valley Gen. Hosp.***, 121 A.3d 1085, 1089 n.1 (Pa.Super. 2015).  Here, the subject operating agreements contained arbitration provisions, which Visitel relied upon in filing preliminary objections to compel arbitration.  Thus, the order appealed from is an interlocutory order appealable as of right.

[3] Subsequently, Visitel merged and transferred its ownership in BV to WWCC, a Delaware corporation of which Pryor, Perretty, and Letzelter were also senior executives.

- 2 -

> 11.1 <u>Mandatory arbitration of certain disputed matters.</u> Any dispute between or among the parties under or relating to this Agreement shall be exclusively and finally resolved by arbitration by a single arbitrator (the "Arbitrator"); <u>PROVIDED</u>, that matters relating to the routine business of the LLC shall be subject to arbitration or litigation by any member.

BV Operating Agreement at 8; BV2 Operating Agreement at 8.

In 2018, Braccia initiated this action, alleging that several parties, including Visitel, via Pryor, Perretty, and Letzelter, conspired to sell BV and BV2 without Braccia's knowledge or permission. In his Second Amended Complaint, Braccia raised claims of fraud, aiding and abetting fraud, civil conspiracy, piercing the corporate veil, breach of contract, unjust enrichment, fraudulent transfer, conversion, accounting, and contempt against Visitel. In response, Visitel filed preliminary objections to transfer the dispute to arbitration based upon the abovementioned arbitration clauses. On July 20, 2020, the trial court overruled Visitel's preliminary objections. Specifically, the trial court determined that because the suit involved voting rights and decision-making surrounding the sale of the properties, the arbitration clauses permitted Braccia to initiate the contract claim in arbitration or litigation pursuant to the "routine business" carveout, and that the arbitration clauses did not encompass the tort claims because those did not concern the operation of the properties.

This timely filed appeal followed. The trial court did not order Visitel to file a concise statement pursuant to Pa.R.A.P. 1925(b), and none was filed. The trial court, however, authored an opinion pursuant to Rule 1925(a).

Visitel presents a single question for our review: "Should the agreement to arbitrate be enforceable in a dispute between the members of an LLC over the distribution of proceeds from the sale of real property owned by that LLC?" Visitel's brief at 3.

Our review of this issue is guided by the following principles:

Our standard of review for an order overruling preliminary objections in the nature of a petition to compel arbitration is:

> [L]imited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court abused its discretion in denying the petition. Where a party to a civil action seeks to compel arbitration, a two-part test is employed. First, the trial court must establish if a valid agreement to arbitrate exists between the parties. Second, if the trial court determines such an agreement exists, it must then ascertain if the dispute involved is within the scope of the arbitration provision. If a valid arbitration agreement exists between the parties, and the plaintiff's claim is within the scope of the agreement, the controversy must be submitted to arbitration.

***Callan v. Oxford Land Development, Inc.****,* 858 A.2d 1229, 1233 (Pa.Super. 2004) (internal citations omitted). In making these determinations, courts must bear in mind:

> (1) arbitration agreements are to be strictly construed and not extended by implication; and (2) when parties have agreed to arbitrate in a clear and unmistakable manner, every reasonable effort should be made to favor the agreement unless it may be said with positive assurance that the arbitration clause involved is not susceptible to an interpretation that covers the asserted dispute.
>
> To resolve this tension, courts should apply the rules of contractual constructions, adopting an

interpretation that gives paramount importance to the intent of the parties and ascribes the most reasonable, probable, and natural conduct to the parties. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement.

*Id*. (internal citations and quotation marks omitted).

[T]he court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement. The court will adopt an interpretation that is most reasonable and probable bearing in mind the objects which the parties intended to accomplish through the agreement.

*Laudig v. Laudig*, 624 A.2d 651, 653 (Pa.Super. 1993).

. . . .

"The existence of an [arbitration] agreement and whether a dispute is within the scope of the [arbitration] agreement are questions of law and our review is plenary." *Warwick Tp. Water and Sewer Authority v. Boucher & James, Inc.*, 851 A.2d 953, 955 (Pa.Super. 2004).

*Provenzano v. Ohio Valley Gen. Hosp.*, 121 A.3d 1085, 1094–95 (Pa.Super. 2015) (cleaned up).

Preliminarily, there is no real dispute that a valid arbitration agreement exists between the parties. The issue, rather, is whether Braccia's contract and tort claims fall within the scope of the arbitration agreement. As noted *supra*, the arbitration clause in the instant case provided for exclusive arbitration of "[a]ny dispute between or among the parties under or relating to" the operating agreement. BV Operating Agreement at 8; BV2 Operating

Agreement at 8. However, "matters relating to the routine business of the LLC shall be subject to arbitration or litigation by any member." *Id*.

We first examine whether the contract claim falls within the scope of the arbitration clauses. Visitel argues that because "the substance of Braccia's claims center on the sale of subject real estate and distribution of the funds thereof, Braccia's claims are covered by the broad language of the arbitration clauses and th[e] matter should be referred to arbitration." Visitel's brief at 19. Visitel further argues that the sale of the properties cannot fall under the routine business carveout:

> Routine is defined [by Merriam-Webster dictionary] as "of a commonplace or repetitious character." The sale of the Properties which BV and BV2 sought to own, develop, and lease, cannot, by definition, be of a common place or repetitious character. It can be done only once. The routine business of BV and BV2 would immediately cease upon such their sale of the Properties.

Visitel's brief at 21-22 (cleaned up).

Braccia, on the other hand, contends that the routine business carveout applies to the contract claim:

> As a 50% member in BV and BV2, Mr. Braccia had voting rights relating to the Properties. Article 3.1 of the operating agreements, entitled "<u>Matters on which members may vote,</u>" provides that, "Except as otherwise expressly provided in this Agreement, each member may vote on all LLC matters." Article 3.3 of the operating agreements, entitled "<u>Number of votes necessary to decide LLC matters,</u>" provides that, "Except as otherwise provided in this Agreement, each LLC matter shall be decided by unanimous vote of the members." As the Properties were sold without Mr. Braccia's knowledge or authorization, [Visitel] clearly violated Mr. Braccia's right to vote under the operating agreements. As LLC voting is routine business of the LLC, Mr. Braccia was permitted to pursue his contract claim in arbitration or litigation.

[Visitel] again misses the mark as it relies on the definition of "routine" as it pertains to "*routine* problems." However, as it relates to "*routine* business," routine is defined [by Merriam-Webster dictionary] as "of, relating to, or being in accordance with established procedure." The operating agreements clearly outline the established procedure for the members' voting rights pursuant to LLC matters.

The substance of Mr. Braccia's contract claim is that he was not afforded his voting rights relating to the Properties. The operating agreements do not discuss the sale of the Properties. [Visitel], therefore, breached the operating agreements when it did not afford Mr. Braccia the opportunity to vote on whether the LLCs should sell the Properties . . . .

Accordingly, Mr. Braccia properly exercised his right under the operating agreements to pursue his contract claim relating to the LLCs' routine business through litigation.

Braccia's brief at 20-22 (cleaned up).

Visitel counters that

[p]ermitting such a tactic would effectively destroy the arbitration clause as any dispute relating to the Operating Agreements could arguably boil down to one party voting for an act and another party voting against that act, or not having the opportunity to vote without any consideration of character of the act or if it is a common or repetitious matter for the company. Such a result is contrary to the clearly stated intent of the parties to resolve any dispute between or among the parties under or relating to the Operating Agreements to be resolved by arbitration, with the sole limited exception of matters relating to the routine business of BV or BV2.

Visitel's brief at 22.

Instantly, Braccia's contract claim is based on the contention that Visitel violated the voting procedures outlined in the operating agreements by selling the properties without first soliciting Braccia's vote. As noted by the parties,

the purpose of BV and BV2 was to operate two properties. Nothing in the operating agreements precluded the parties from selling the properties. Accordingly, any decision to sell the properties would have been subject to the voting procedures outlined in the operating agreements, *i.e.*, a unanimous vote to sell by both members. We agree with Braccia and the trial court that the operating agreements' voting procedures constitute routine business. **See** TCO, 6/16/21, at 4. As such, pursuant to the routine business carveout, Braccia was permitted to bring suit in either private arbitration or in court for this claim. Braccia chose litigation. Thus, we conclude that the trial court's findings are supported by substantial evidence and it did not abuse its discretion in overruling Visitel's preliminary objections as to the contract claim.

Finally, we examine whether Braccia's tort claims fall within the scope of the arbitration clauses. As noted, the subject arbitration clauses provide that "[a]ny dispute between or among the parties **under or relating to** [**the operating agreement**] shall be exclusively and finally resolved by arbitration[,]" subject to the routine business carveout. BV Operating Agreement at 8; BV2 Operating Agreement at 8 (emphasis added). "A broad arbitration clause in a contract is one that is unrestricted, contains language that encompasses all disputes which relate to contractual obligations, and generally includes all claims arising from the contract regardless of whether the claim sounds in tort or contract." **Provenzano**, **supra** at 1096 (cleaned up). In other words,

[a]n agreement to arbitrate disputes arising from a contract encompasses tort claims where the facts which support a tort action also support a breach of contract action. A claim's substance, not its styling, controls whether the complaining party must proceed to arbitration or may file in the court of common pleas.

*Callan*, *supra* at 1233 (cleaned up).

Visitel argues that because "the substance of Braccia's [contract and tort] claims center on the sale of subject real estate and distribution of funds thereof, Braccia's claims are covered by the broad language of the arbitration clauses and this matter should be referred to arbitration." Visitel's brief at 19. Braccia, on the other hand, contends that the "fraudulent and deceptive conduct" underlying the tort claims do "not in any form arise under or relate to the operation of the Properties and therefore [fall] outside the scope of the applicable arbitration provisions." Braccia's brief at 18 (citation omitted). The trial court agreed with Braccia, concluding that because the tort claims did not pertain to the operation of BV or BV2, they were not subject to the arbitration provisions.

Visitel relies on this Court's decision in *Shadduck v. Christopher J. Kaclik, Inc.*, 713 A.2d 635 (Pa.Super. 1998). In *Shadduck*, the Shadducks entered a building contract with Christopher J. Kaclik, Inc. ("Builder") to build the Shadducks' home. The contract included a provision mandating arbitration for all disputes arising out of the contract. Subsequently, the Shadducks filed a complaint against Builder for fraudulent misrepresentation and violations of the Uniform Trade Practices and Consumer Protection Law

("UTPCPL") regarding the construction of the home. The Shadducks also filed a demand for arbitration based on the allegation that Builder's faulty construction of the Shadducks' home constituted a breach of the parties' contract and warranty obligations. In response, Builder, *inter alia*, filed preliminary objections in the nature of a motion to compel arbitration, arguing that the parties' agreement contemplated arbitration for all disputes and claims, whether in tort or contract. The trial court denied Builder's preliminary objections and Builder appealed to this Court.

On appeal, Builder argued the arbitration provision within the building contract "was broadly worded and, by its plain language, contemplated that all disputes, whether styled in tort or contract language, be submitted to arbitration." *Id*. at 637. The Shadducks conversely argued the arbitration provision "was limited to causes of action sounding in contract and that they were permitted, therefore, to file the . . . tort claims in the court of common pleas." *Id*.

Upon review of the arbitration provision, which contained no limiting language that would imply only contract claims fell within the purview of the provision, we determined that all claims arising out of the building contract would be subject to the mandatory arbitration provision. *Id*. at 637-38. Thus, this Court next considered whether the claims at issue actually arose from the building contract or the breach thereof. The Shadducks cited ***Nealy v. State Farm Mut. Auto. Ins. Co.***, 695 A.2d 790 (Pa.Super. 1997), for the

proposition that tort-based statutory claims are separate from claims arising under a contract and therefore should not be subject to a mandatory arbitration provision. This Court found **Nealy** distinguishable. In **Nealy**, we concluded that due to the unique nature of bad faith claims, and because the behavior underpinning the bad faith claim was "temporally and factually distinct from any behavior that would impact upon the outcome of the damages and liability disposition of the contract claim," our courts of common pleas held original jurisdiction over the bad faith claim. **Shadduck**, 713 A.2d at 638 (quoting **Nealy**, **supra** at 794).

In **Dodds v. Pulte Home Corp.**, 909 A.2d 348, 350-51 (Pa.Super. 2006), this Court concluded, based upon **Shadduck**, that plaintiffs' addition of fraud charges did not remove the action from the scope of the arbitration agreement therein because there was "no separate time period or facts" for the fraud charges, and all claims were related to the agreement or purchase of the home, and the arbitration agreement explicitly covered disputes arising out of or related to the agreement or purchase of the home.

In **Fellerman v. PECO Energy Co.**, 159 A.3d 22, 24 (Pa.Super. 2017), this Court applied the above principles to determine whether claims of negligent misrepresentation, fraud, violations of the [UTPCPL], and breach of contract against defendant Historic Home Inspection, LP ("Historic") fell within an agreement to arbitrate "any dispute between the parties. . . that in any way, directly or indirectly, aris[es] out of, [is] connected with, or relat[es] to

the interpretation of" the inspection agreement. The Fellermans' claims all were premised upon Historic's alleged failure to provide proper services, in breach of the inspection agreement. Since the tort claims arose from duties allegedly owed under the inspection agreement, and thus the facts in support of the tort action also supported a breach of contract action, we held that the tort claims were subject to the agreement to arbitrate. *Id*. at 30-31 (citing *Callan*, *supra*).

Stated plainly, the foregoing case law distills to the following: Generally, a tort claim will fall within the scope of an agreement to arbitrate disputes arising out of or relating to a contract where the facts supporting the tort claim also support a breach of contract claim. However, a tort claim will fall outside such an agreement to arbitrate if the facts supporting the tort claim are different from the facts supporting the breach of contract claim, and the different behaviors complained of happened during separate time periods.

Despite this general rule, the routine business carveout in the subject arbitration clauses provides a unique wrinkle. Here, if the facts supporting the tort claims also support the breach of contract claim herein, *i.e.*, that Visitel violated the voting procedures outlined in the operating agreements by selling the properties without first soliciting Braccia's vote, then Braccia would be permitted to bring suit in either private arbitration or in court for those claims pursuant to the routine business carveout.

Instantly, Braccia's tort claims against Visitel are based upon Pryor, Perretty, and Letzelter

> devis[ing] a plan and conspir[ing] among themselves and with others to sell the BV and BV2 properties out from underneath Mr. Braccia. Indeed, they negotiated the sale of the properties without Mr. Braccia's knowledge, intentionally withheld material information relating to the sale from Mr. Braccia, forged the companies' original resolutions for sale by removing Mr. Braccia's signature block in order to push the sale through without Mr. Braccia's knowledge or consent, misrepresented their authority to sell the properties on behalf of BV and BV2, and then quickly transferred and hid the proceeds of the sale in various accounts they controlled so Mr. Braccia could not find or recover the portion of the proceeds that are rightfully his.

Second Amended Complaint, 6/3/19, at 3. At their essence, these claims can be divided into two categories. The first category of tort claims is based upon the fraudulent sale of the properties. *See* Second Amended Complaint at 23-24 (fraud), 25 (aiding and abetting fraud), 26 (civil conspiracy), 26-27 (piercing the corporate veil), 28 (unjust enrichment), 28-31 (fraudulent transfer), and 31 (conversion). The second category of tort claims is based upon Visitel hiding the proceeds from the sale. *See id*. at 23-24 (fraud), 25 (aiding and abetting fraud), 26 (civil conspiracy), 26-27 (piercing the corporate veil), 28 (unjust enrichment), 28-31 (fraudulent transfer), 31 (conversion), 36-37 (accounting), and 37-38 (contempt).

The facts underlying the first category of tort claims, *i.e.*, those based upon Visitel's fraudulent circumvention of Braccia's voting rights in selling the property, also support Braccia's breach of contract claim. Generally, under a broad arbitration provision, those claims would then be subject to an

agreement to arbitrate. Here, however, as with the breach of contract claim, those claims fall within the routine business carveout. Braccia therefore was permitted to bring suit in either private arbitration or in court for those claims. He chose litigation. Accordingly, the trial court did not abuse its discretion in overruling Visitel's preliminary objections as to those tort claims.

The second category of tort claims, those based upon Visitel hiding the proceeds of the fraudulent sale, are factually and temporally distinct from Braccia's contract claim that Visitel failed to comply with the voting procedures of the operating agreements prior to selling the properties. Specifically, hiding the proceeds was temporally distinct from Braccia's contract claim because it occurred during a separate time period, *i.e.*, after the allegations relevant to breaching the operating agreements' voting procedures ended. Additionally, the acts supporting the allegations pertaining to hiding the proceeds do not also support the breach of contract claim. We therefore agree with the trial court that those tort claims fall outside the scope of the arbitration clauses as they do not arise under or relate to the operating agreements. Accordingly, the trial court did not abuse its discretion in overruling Visitel's preliminary objections as to those tort claims.

Based on the foregoing, we affirm the order overruling Visitel's preliminary objections.

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 1/3/2022*